UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRYSTAL CLARK,

                        Petitioner,                       Case No. 2:19-cv-11166
                                                      Hon. Denise Page Hood

v.

SHAWN BREWER,

                        Respondent.

_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING MOTION FOR IMMEDIATE RELEASE, AND (2) DENYING A CERTIFICATE OF APPEALABILITY**

Krystal Clark, a Michigan prisoner, filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. Following a jury trial in the Wayne Circuit Court, Petitioner was convicted of armed robbery, MICH. COMP. LAWS §750.529, and assault with intent to commit great bodily harm. MICH. COMP. LAWS §750.84. Petitioner is serving a 17-30 year sentence for the robbery conviction and 10-15 year sentence for the assault conviction.

The habeas petition raises eleven claims: (1) insufficient evidence was presented at trial to sustain Petitioner's convictions, (2) the trial court failed to properly instruct the jury on the mental state required for the offenses, (3) Petitioner is entitled to resentencing if either of her convictions is reversed, (4) the prosecutor knowingly presented false testimony, (5) the jury observed Petitioner in

1

jail clothing, (6) the trial court failed to instruct the jury on the unreliability of accomplice testimony, (7) trial counsel was ineffective for failing to request that jury instruction, (8) a biased juror was erroneously allowed to serve on the jury, (9) Petitioner was deprived the right of a unanimous verdict when the jury was not instructed that they were required to agree on the theory of culpability, (10) trial counsel was ineffective for failing to advise Petitioner to accept a plea bargain, and (11) appellate counsel was ineffective for failing to raise Petitioner's post-conviction claims on direct appeal.

The Court will deny the petition because the claims are without merit or procedurally barred from review. The Court will also deny Petitioner a certificate of appealability.

## I. Background

The charges against Petitioner and her two brothers, Darryl and Demetrius Clark, arose from a robbery occurring at a Detroit residence. Another man involved in the crime was arrested near the scene of the crime, and he along with the owner of one of the vehicles used during the robbery led police to the Clark siblings. Proceeds from the robbery and weapons were found during the arrests.

At the joint jury trial, Edward Taschereau testified that at around 2:30-3:00 p.m. on May 8, 2010, he was at his brother's house on Grayfield Street in Detroit. He answered the front door and was confronted by a man with a handgun. Three

2

men then forced their way into the house and demanded to know the location of a safe. The men left with video game consoles and other items taken from the house, including a small safe. Taschereau saw a woman standing by a black car outside the house.

Michigan State Police Trooper Jonathan Henry testified that at about 3:45 p.m. that day, he was off-duty and driving his personal vehicle on Fenkell near Grayfield. He saw four males run across Fenkell. One entered the passenger side of a silver van. The other three got into a black car on Grayfield which was driven by a woman. As the last man entered the car he turned and fired two shots from a handgun in the direction of a house.

The car then followed the van away from the scene. Henry called 9-1-1 and followed the vehicles. One of the passengers of the car leaned out of the rear window and fired a handgun at Henry. Henry returned fire. Another person in the car fired a long gun through the rear window the car. Henry then saw another individual on foot next to the road fire two shots at his vehicle.

Henry spotted and flagged down a Detroit Police car, and they went to the area where the pedestrian with the gun had been firing. After a foot chase, police arrested Kevin Woods, who was identified as the man who had shot at Henry on foot.

Alfreda Jones testified that she was near the intersection of Kendall and Rosemont in Detroit on the date in question. She saw a van approached at a high rate of speed. She then saw a man jump out of the van with a gun, and Jones heard three gunshots. The circumstances and timing suggested that Jones saw Woods exit the van to ambush Henry as he pursued the two vehicles.

Virginia Gonzales testified that she knew Darryl, Demetrius, and Petitioner. At about 11:00 a.m. on the date of the incident she drove Darryl, Demetrius, Woods, along with others to Petitioner's  house in her black car. Darryl, Demetrius, and Woods went inside and returned with Petitioner. Gonzales followed behind Petitioner's van.

The two vehicles drove to the parking lot of a bar where Gonzales heard Petitioner tell Darryl that the house across the street had enough money and drugs for them to move out of Detroit. Darryl had a silver revolver. He directed Gonzales to drive around the block while Woods walked to the house on foot. Petitioner stayed in the parking lot of the bar.

Gonzales saw Woods go into the house with a handgun, and Darryl and Demetrius then exited her car and ran behind him into the house. The three men returned a few minutes later. Demetrius was carrying a small safe and a long gun. Woods ran to the van, and the other two got into her car. Gonzales heard two or three shots before Darryl got inside her car. She drove away at a high rate of speed.

4

Gonzales was followed by a black SUV. Darryl fired shots at the SUV from the passenger window. She heard other shots coming from where Demetrius was seated. The occupant of the SUV fired at her car. Gonzales heard Demetrius say on the phone that they were out of ammunition and that Woods had to do something. She then saw Woods standing on the sidewalk with a gun, which he fired at the passing SUV.

She then circled back to get Woods, but she could not stop because the SUV was chasing her car. Gonzales managed to lose the SUV, and she drove to Darryl's mother's house. They met up with Petitioner's van, and they removed a video game console taken from the house. Petitioner said she had also returned to try to pick up Woods, but she found that he was already arrested.

Gonzales later learned that police were looking for her. Petitioner told her to turn herself in, but not to implicate Darryl or Demetrius. At the police station Gonzales initially told officers that she had merely given Woods a ride to the area, and that she heard shots, but she did not know what was going on.

The following day, Gonzales recanted, and then she made a series of statements implicating Woods, Darryl, and Demetrius. Gonzales later pled guilty to being an accessory after the fact with an agreement to serve one year in jail. In exchange, Gonzales agreed to testify against Petitioner, Darryl, and Demetrius.

Detroit Police Officer Michael Gordon testified that on the date of the incident he was at home and heard shots. He looked out of his window and saw a black SUV following a black car, and a man on the driveway across the street attempting to unjam a weapon. The pedestrian waived to a van but then ran into the backyard of a house. Gordon reported the location of the pedestrian and observed responding officers arrest him.

Armando Huffman testified that he was at home when he heard sounds of gunfire. He looked out of his window and saw a car with a shattered rear window followed by an SUV. A person ran out from the side of a house, pointed a gun at the SUV and fired shots at it. When several police cars arrived, Huffman pointed out the man who fired the shots, and he was arrested.

Michigan State Police Trooper David Jeffries responded with his partner to the scene. He assisted in arresting Woods. In Woods' pockets, officers found a .45 caliber handgun, two cell phones, a pill vial, a gallon size baggie half-full of marijuana, and two wallets. Additional police witnesses testified to forensic evidence they discovered tying the weapons found on co-defendants and Woods with the crime and the vehicles.

The jury found Petitioner guilty of assault with intent to do great bodily harm and armed robbery, but not guilty of first-degree home invasion. She was

sentenced to concurrent terms of 17-30 years for armed robbery and 10-15 years for assault.

Following her conviction, Petitioner filed a claim of appeal. Her appointed appellate counsel filed a brief on appeal that raised three claims:

> I. Appellant was denied due process when convicted of assault with intent to do great bodily harm and armed robbery where the prosecutor failed to prove Appellant's acts or encouragement, as either a principal or an aider and abettor, caused the assault or the robbery.

> II. The court denied Appellant due process when it denied her request to instruct the jury that the shootings were a separate crime within the common unlawful enterprise where Appellant maintained that she could not be part of the charged offenses because she did not help anyone commit those offenses.

> III. Appellant is entitled to a resentencing because her remaining sentence will exceed the range of the Michigan Sentencing Guidelines if this Court vacates one but not both of her convictions.

Following a hearing in the trial court on a motion for new trial, Petitioner filed a supplemental brief raising one additional claim:

> IV. Appellant was denied her state and federal due process rights where her convictions were obtained through the use of false and perjured testimony.

The Michigan Court of Appeals affirmed in an unpublished opinion. *People v. Clark*, No. 305601, 2014 WL 354623, at *1, 9–10 (Mich. Ct. App. Jan. 30, 2014). Petitioner presented the same claims to the Michigan Supreme Court, but

her application for leave to appeal was denied by standard order. *People v. Clark*,

852 N.W.2d 176 (Mich. 2014)(Table).

Petitioner then filed a motion for relief from judgment in the trial court,

raising the following six claims:

> I. Defendant was denied her state and federal constitutional right to due process when the jury observed her in jail clothing on the first day of trial.

> II. The trial court committed plain error in failing to instruct the jury that it should view with caution the testimony of Virginia Gonzales, who was an undisputed accomplice. This denied Defendant her state and federal constitutional right to present a defense.

> III. Defendant was denied her state and federal constitutional right to the effective assistance of counsel, where trial counsel failed to request a cautionary instruction on the unreliability of accomplice testimony.

> IV. Defendant was denied her right to a fair and impartial jury and her right to effective assistance of counsel, who failed to further question, dismiss for cause or use a peremptory challenge to dismiss a biased juror.

> V. Where the jury could convict Defendant of one offense based upon two statutory theories of culpability, she was denied her constitutional right to due process and a unanimous jury where both theories were not made a choice on the verdict form and trial counsel was ineffective for failing to object to the verdict form.

> VI. Defendant's convictions should be reversed and the plea offer reinstated where Defendant would have accepted the plea were it not for the fact that defense counsel gave erroneous advice and Defendant was prejudiced.

The trial court denied the motion for relief from judgment in an opinion dated March 21, 2017. (ECF No. 9-19, PageID.2540.) The court found that Petitioner failed to demonstrate good cause or actual prejudice under Mich. Ct. R. 6.508(D)(3) to excuse her failure to raise her new claims on direct review. (*Id.*, PageID.2542-45.)

Petitioner raised the same claims in the Michigan Court of Appeals, but her application for leave to appeal was denied "for failure to establish that the trial court erred in denying the motion for relief from judgment." (ECF No. 9-22, PageID.2876.) The Michigan Supreme Court thereafter denied leave to appeal with respect to the same issues with citation to Michigan Court Rule 6.508(D). (ECF No. 9-23, PageID.2971.)

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.... As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

## III. Discussion

A. Sufficiency of the Evidence

Petitioner first asserts that insufficient evidence was presented at trial to support her convictions. Specifically, she asserts that the prosecutor failed to offer evidence that she performed acts of encouragement sufficient to demonstrate that she aided and abetted in the assault or armed robbery. After reciting the standard of review and the law regarding the elements of the offenses and aiding and abetting, the Michigan Court of Appeals rejected the claim on the merits:

> Gonzales testified that on May 8, 2010, she drove Darryl and Demetrius Clark and Woods to Krystal Clark's house, that Krystal Clark started driving her silver van, and that Gonzales followed the van at Darryl Clark's direction to a bar parking lot on Grayfield. In Gonzales's presence, Darryl Clark conversed with Krystal Clark, and Gonzales heard Krystal Clark say, "[T]he house was across the street on the corner; that there was a lot of money in this house and suppose [sic] to be drugs in this house," something Krystal Clark reportedly had heard from her children's father. Krystal Clark pointed toward the house. Gonzales then heard Darryl Clark question whether Krystal Clark "knew what actually was in the house," to which Krystal Clark responded "that there was enough money for them to get out of Detroit if they got in there." According to Gonzales, Krystal Clark and the silver van stayed in the parking lot, while Gonzales dropped off Woods in an alley and navigated the Monte Carlo to Grayfield near its intersection with Fenkell. From the Fenkell–Grayfield intersection, Gonzales watched Darryl and Demetrius Clark go inside the house down the block on Grayfield, then noticed that Krystal Clark had moved her silver van to the same intersection. Taschereau testified about the three men who broke into the house on Grayfield, Darryl Clark and Woods pointing handguns at his head, and eventually leaving with personal property.

Gonzales recounted that she saw all three men leave the house, run toward the Monte Carlo and the silver van, Woods get into the silver van, and Darryl and Demetrius Clark get inside the Monte Carlo. Gonzales then drove her Monte Carlo in pursuit of Krystal Clark, who was driving the silver van. Henry testified that while stopped in traffic at the intersection of Fenkell and Grayfield, he saw four or five African–American men run across Fenkell, one or two of the men get inside a silver Chevrolet Venture stopped in traffic in front of his Suburban, and the other two or three get inside a black Monte Carlo parked on Grayfield. Henry observed the silver van speed away north on Grayfield and the Monte Carlo follow the silver van, so Henry began following the van and the Monte Carlo. Henry testified that he lost sight of the silver van, but remained behind the Monte Carlo for approximately 15 minutes as it sped through residential neighborhoods. Henry remembered seeing the silver van later during his pursuit of the Monte Carlo "parked at the corner of Schoolcraft and Rosemont."

Police officers recovered Taschereau's cell phone from Woods. Taschereau testified that after the theft of his cell phone, someone had accidentally called his daughter and left her a voicemail, which police officers played for Taschereau and the prosecutor played for the jury. Taschereau described that he heard the sounds of "scuffling in the background," but could understand the declaration, "[W]e got the safe, we got the safe." Gonzales identified the female voice on the recording as Krystal Clark's voice.

A rational jury could have found beyond a reasonable doubt that Krystal Clark aided and abetted Darryl and Demetrius Clark and Woods in committing an armed robbery. Before the crime, Krystal Clark encouraged the Clarks and Woods to commit the armed robbery. She pointed out the house on Grayfield and her belief regarding what valuables the house contained. The jury could reasonably infer Krystal Clark's larcenous intent while pointing out the Grayfield house on the basis of her comment about potentially finding "enough money for them to get out of Detroit if they got in there." Abundant other evidence established that Darryl and Demetrius Clark and Woods went inside the house on Grayfield, assaulted Taschereau with handguns, and took personal property. Furthermore, Krystal Clark parked the silver van near Gonzales's

Monte Carlo within eyesight of the robbery target, awaited Woods's entry into the van, and sped away from the robbery scene. *People v. Norris*, 236 Mich. App. 411, 419–422; 600 NW2d 658 (1999) (finding the evidence sufficient to support an armed robbery conviction under an aiding and abetting theory where a store worker saw the defendant enter the store with several other men and leave, and other witnesses testified to their observations of a getaway car driven by the defendant). Viewed in a light most favorable to the prosecution, the evidence was sufficient to sustain Krystal Clark's conviction of aiding and abetting the armed robbery on Grayfield.

***

The testimony of Gonzales and Taschereau established that Woods had a handgun when he pushed his way inside the house on Grayfield. The testimony of Gonzales and Henry established that Krystal Clark drove Woods away from the robbery scene; Gonzales drove Darryl and Demetrius Clark away from the robbery scene; Darryl and Demetrius Clark fired guns at Henry from the Monte Carlo; Darryl and Demetrius Clark called Woods from the Monte Carlo to ask for assistance because they had spent their ammunition; and Woods appeared twice in the area of Rosemont and Schoolcraft to fire at Henry's Suburban, the same area in which Henry had spotted the silver van later in his pursuit of the Monte Carlo. A police officer resident of Rosemont testified that he heard something that sounded like rocks striking his house, looked outside and saw a black Suburban and a car driving down the street; he also observed a man directly across the street "trying to unjam" a gun, the same man make a phone call, and walk toward a white or grey Chevrolet Venture van, which the man with the gun eventually waved away after the sound of police sirens became audible. The reasonable inferences arising from this evidence are that Krystal Clark assisted in Woods's shooting at Henry by spiriting him away from the armed robbery scene and dropping off Woods near Rosemont and Schoolcraft. In light of the evidence that Woods possessed a handgun during the armed robbery and after his arrest, and that Darryl and Demetrius Clark contacted Woods to request assistance after running out of ammunition, reasonable inferences also establish that at the time Krystal Clark dropped off Woods, she knew that Woods intended to assault Henry and inflict great bodily harm.

The jury also could have found Krystal Clark guilty of aiding and abetting Woods's assault of Henry as "a natural and probable consequence" of her participation in the armed robbery. *Robinson*, 475 Mich. at 15. The evidence was sufficient to prove beyond a reasonable doubt that Krystal Clark helped plan the armed robbery in which Darryl Clark and Woods used guns, awaited Woods's return to her silver van and Darryl and Demetrius Clark's return to Gonzales's Monte Carlo, was present when Darryl Clark fired gunshots just before getting into the Monte Carlo, led Gonzales in the high-speed attempt to escape through residential areas, and eventually dropped off Woods on Rosemont where he twice shot at Henry. The principals' use of multiple firearms and Krystal Clark's initiation of the high-speed chase through residential neighborhoods allowed the jury to find beyond a reasonable doubt that the assault on Henry "came within the common enterprise [Krystal Clark] aided" because the shooting at Henry "might be expected to happen if the occasion should arise within the common enterprise of" the armed robbery. Id. at 11 (internal quotation and citation omitted).

*Clark*, 2014 WL 354623, at \*9-11 (footnote omitted).

This decision did not involve an unreasonable application of clearly established Supreme Court law. It is well established that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Under the Due Process Clause, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). A federal court reviewing a state court conviction under the habeas corpus statute that is "faced with a record of historical facts that supports conflicting inferences must

presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos v. Smith*, 565 U.S. 1, 7 (2011).

On direct appeal, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. That rubric "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id*. at 324 n.16, and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). The Sixth Circuit reads those cases as creating a gauntlet for state prisoners asserting a sufficiency-of-evidence challenge under the AEDPA: they must penetrate "two layers of deference to groups who might view facts differently" than a reviewing court on habeas review — the factfinder at trial and the state court on appellate review. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Petitioner's argument boils down to her assertion that the evidence indicated only that she happened to be the driver of the van when the three men involved were near the location of the victims' house, and that she just happened to "note" to the men that the house was one that contained a lot of money and drugs. She states that she neither overtly assisted the men in committing the crimes, nor did

she explicitly direct them to commit the offenses. (*See* Reply, ECF No. 10, PageID.3054.)

Certainly, that was the narrative defense counsel offered to the jury. But it does not follow that there was insufficient circumstantial evidence to support a finding of guilt beyond a reasonable doubt that Petitioner took an active role in planning and aiding the commission in the crimes. Petitioner did not simply mention that the house had money and drugs - the testimony was that she told Darryl Clark that it had enough drugs and money inside *for them to leave Detroit if they got in there*. Tr. 6/6/11, at 176-77. A jury could easily and reasonably interpret that statement as a suggestion or direction to the men to rob the house. Then, during the getaway from robbery, one of the victims' daughters received a message from her father's stolen cellphone—a circumstance suggesting a perpetrator accidentally used the wrong cellphone—that contained what the jury could have found to be Petitioner's voice saying, "We got the safe, we got the safe." Tr. 6/3/11, at 26–30. This statement by Petitioner certainly constituted circumstantial evidence that she was a participant in the robbery.

Furthermore, Petitioner, knowing what she told her brothers and Woods before the robbery, and knowing what they had accomplished, then helped Woods escape the scene in her van. Tr. 6/3/11, at 198–211, 245–46. Finally, when her brothers ran out of ammunition firing at the pursuing off-duty state trooper in his

SUV, Petitioner stopped the van to allow Woods to get out so he could fire on the SUV. Tr. 6/6/11, 199–206.

In other words, ample evidence was presented at trial to allow the jury to find beyond a reasonable doubt that Petitioner was not a mere bystander, but that she was an active participant in the crimes of conviction. More to the point, and in view of the record evidence, the Michigan Court of Appeals' determination that sufficient evidence was presented did not result in an objectively unreasonable application of the *Jackson* standard. The claim is without merit.

B. Jury Instructions

Petitioner's second claim asserts that the trial court erred in failing to instruct the jury that in order to convict her of aiding Woods' assault of the off-duty trooper during the chase, they were required to find an intent to aid in that specific crime, and not just an intent to aid in the commission of the general common criminal enterprise.

The Michigan Court of Appeals found that the instruction was not warranted under state law:

In Docket No. 305601, Krystal Clark argues that the trial court should have instructed the jury, in conformity with CJI2d 8.3, that it could not convict her of the assault on Henry because the record did not prove that she intended to assist anyone in committing that separate crime. As discussed in Issue V, supra, the evidence was sufficient to prove beyond a reasonable doubt that Krystal Clark aided and abetted Woods's assault of Henry as "a natural and probable consequence of" her participation in the armed robbery. *Robinson*,

> 475 Mich. at 15. The principals' use of multiple firearms and Krystal
> Clark's initiation of the high-speed chase through residential
> neighborhoods also allowed the jury to find beyond a reasonable
> doubt that the assault on Henry "came within the common enterprise
> [Krystal Clark] aided." *Id*. Because the evidence established that the
> shooting at Henry while in flight constituted a natural and probable
> consequence of the armed robbery, the trial court acted within its
> discretion by determining that CJI2d 8.3
> "does not apply to the facts of record." *See People v. Hartuniewicz*,
> 294 Mich. App. 237, 242; 816 NW2d 442 (2011).

*Clark*, 2014 WL 354623, at *11.

An erroneous jury instruction warrants habeas corpus relief only where the

instruction "'so infected the entire trial that the resulting conviction violates due

process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)(quoting *Cupp v. Naughten*,

414 U.S. 141, 147 (1973)). "[I]t must be established not merely that the instruction

is undesirable, erroneous, or even 'universally condemned,' but that it violated

some [constitutional] right." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

The jury instruction "'may not be judged in artificial isolation,' but must be

considered in the context of the instructions as a whole and the trial record."

*Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). The Court must "inquire

'whether there is a reasonable likelihood that the jury has applied the challenged

instruction in a way' that violates the Constitution." *Ibid*. (quoting *Boyde v.*

*California*, 494 U.S. 370, 380 (1990)).

The Michigan Court of Appeals held that the trial court was correct in

declining to give the requested instruction because application of the "common

enterprise" principle was not applicable to the facts of the case. That decision, therefore, involved the application of substantive state law concerning what specific mental states sufficed to satisfy the *mens rea* for the charged crimes, given the evidence presented at trial. This Court cannot second-guess that state court determination of the application of a state law principle. *Estelle*.

The only federal constitutional right implicated by the claim is the right to have the jury instructed that it must find beyond a reasonable doubt each element of the charged offenses, including the *mens rea* element. *See, e.g., Sandstrom v. Montana*, 442 U.S. 510 (1979). But here, the jury was fully instructed regarding that obligation. The trial court instructed the jury:

> Anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as an aider and abettor.

> To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the alleged crimes were actually committed either by the Defendant or someone else. It does not matter whether anyone else has been convicted of the crimes.

> Second, that before or during the crimes the Defendant did something to assist in the commission of the crimes and, third, the Defendant must have intended the commission of the crimes alleged or must have known that the other person intended its commission at the time of giving the assistance. In this case the Defendant Krystal Denise Clark is charged with committing Count I, assault with intent to murder John Henry or the less serious offense of assault with intent to do great bodily harm less than murder of John Henry and Count III, armed robbery of Edward Taschereau and Count IV, home invasion first degree of the dwelling located at 15174 Grayfield, Detroit,

19

Michigan or intentionally assisting someone else in committing any or all of them.

* * *

It does not matter how much help, advice or encouragement the Defendant gave. However, you must decide whether the Defendant intended to help another commit the crimes and whether the Defendant's help, advice or encouragement actually did help, advise or encourage the crimes. Even if the Defendant knew that the alleged crimes were planned or were being committed the mere fact that the Defendant was present when they were committed is not enough to prove that the Defendant committed them or assisted in committing them.

Tr. 6/14/11, at 162-64.

Petitioner has failed to show that the Court of Appeals' conclusion that the requested jury instruction was not appropriate under state law deprived him of a right secured by the Constitution, where the record indicates that the jury was instructed on the requirement that the prosecutor prove the *mens rea* for the crime beyond a reasonable doubt. The claim is without merit.

C. Resentencing if any Conviction Vacated

Petitioner's third claim asserts that she is entitled to resentencing if the Court grants her relief as to any of her convictions. She argues that the elimination of any of her convictions would lower the sentencing guidelines. Because the Court is not granting Petitioner relief, this claim is moot.

D. False or Perjured Testimony

Petitioner's fourth claim asserts that Gonzales lied during her trial testimony, and that the prosecutor knew he was presenting false testimony. This claim was raised in Petitioner's motion for new trial, and the trial court denied the motion after holding an evidentiary hearing. The Court of Appeals then denied the claim on the merits:

> The trial court conducted an evidentiary hearing to address Krystal Clark's contentions that Gonzales had disclosed to two jail inmates, Lakeisha Lawson and Michelle Renaud, that she fabricated her trial testimony. The court heard testimony from Gonzales, Lawson, Renaud, and Krystal Clark's mother. The court found that neither Lawson nor Renaud could offer "any specificity as to what supposedly [Gonzales] had lied concerning," while Gonzales "maintained the testimony that she gave at the time of the trial" was "factually accurate, truthful," and unmotivated by prosecutorial coercion. With respect to Gonzales's credibility, the court found that "the credibility of Ms. Gonzales by far and away outweighs the testimony of Ms. Lawson and Ms. Renaud," in part because Krystal Clark, Lawson, and Renaud "were jointly housed in ... the Huron Valley Women's Correctional Facility," which "provided ample time for all three people to ostensibly conspire with each other and exchange information with each other in an effort to negate the adverse jury verdict that had been found against ... Krystal Clark." The court opined "that Ms. Lawson's testimony and Ms. Renaud's testimony were trumped up" or "suggested at the very minimum by ... Krystal Clark." The court denied the motion because the testimony of Lawson and Renaud "would provide nothing to ... support[] the defense of [Krystal Clark] in regard to this case, and ... the outcome of this trial would ... not have been any different than what was ultimately arrived at by the jury." The court did not clearly err in its findings of fact, all of which had ample support in the evidentiary hearing testimony. We conclude that the trial court did not abuse its discretion by denying Krystal Clark's motion for a new trial because

Krystal Clark could not substantiate her claim that the allegedly new evidence would have made "a different result probable on retrial." *Id*.

*Clark*, 2014 WL 354623, at *11–12.

The deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150, 153 (1972). To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). However, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).

Petitioner has not and cannot show that Gonzales' testimony was false. The trial court made a factual finding that Lawson and Renaud's testimony that Gonzales told them that she had lied on the stand was itself not credible. The court also found that Gonzales' testimony that she had not lied during trial was credible. These state court credibility determinations undermine the factual basis for Petitioner's claim. Such factual findings by a state court are presumed to be correct on federal habeas review unless the petitioner can show that they are false with

22

clear and convincing evidence. *See Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001); 28 U.S.C. § 2254(e)(1). Petitioner offers no evidence, let alone clear and convincing evidence, to show that the trial court's credibility determinations were incorrect. Petitioner points only to the same testimony considered and rejected by the trial court. Accordingly, Petitioner fails to show that the prosecutor offered false testimony. The claim is without merit and was reasonably rejected by the state court.

E. Claims Raised in Motion for Relief from Judgment

Petitioner's remaining claims were presented to the state court in her motion for relief from judgment and the appeal that followed its denial. Respondent argues that review of these claims is procedurally barred because the trial court denied relief based on Michigan Court Rule 6.508(D)(3). That rule prohibits a defendant from raising claims on state collateral review that were not raised on direct appeal absent a showing of "good cause" and "actual prejudice."

Claims that are rejected by a state court on independent state procedural grounds are barred from subsequent federal habeas review absent a showing of cause to excuse the failure to comply with the rule and prejudice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

In this case, the state trial court denied Petitioner post-conviction relief on these claims because she failed to demonstrate good cause or actual prejudice

resulting from the failure to raise the claims on direct appeal as required by Rule 6.508(D)(3). (ECF No. 9-19, PageID.2540-45.) The basis for the decision constitutes an independent and adequate state procedural ground. *See Ivory v. Jackson*, 509 F.3d 284, 292-93 (6th Cir. 2007). Petitioner's post-conviction claims are therefore barred pursuant to that rule.

To demonstrate entitlement to habeas review of the defaulted claims, Petitioner must establish either (1) cause for the default and prejudice from the alleged constitutional violations, or (2) that failure to consider the claims would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Petitioner asserts in her eleventh claim that her appellate attorney's ineffectiveness constitutes cause and excuses his default. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) (ineffective assistance of appellate counsel may constitute cause excusing a procedural default). However, an attorney is not required "to raise every non-frivolous issue on appeal." *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003). Indeed, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). A failure to raise a claim on appeal will generally constitute deficient performance

only if the omitted claim is "clearly stronger" than the claims raised on direct review. *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Here, Petitioner fails to show that Petitioner's post-conviction review claims are clearly stronger than the ones raised by her appellate attorney on direct review. Briefly, Petitioner's fifth claim is not clearly stronger because, as found by the Michigan Court of Appeals, Petitioner and her brothers refused to change out of their jail clothes on the first day of trial. *Clark*, 2014 WL 354623, at *1-3. No State action compelled them to wear jail garb, and it was the court's understanding that they refused to change their clothing. Tr. 5/31/11, at 8. Petitioner's claim would have been rejected in direct review on the same basis as her bothers' claims.

Petitioner's sixth claim asserting erroneous instructions on accomplice testimony is not clearly stronger than her direct appeal claims because the claim was waived when the defense agreed to the instructions. Tr. 6/14/11, at 174-75. And as with her fifth claim, Petitioner's brothers raised the claim on direct appeal and the Court of Appeals rejected it. *Clark*, 2014 WL 354623, at *5-6.

Petitioner's next claim asserts that one of the jurors was biased because he initially answered "yes" when asked by defense counsel if he expected Demetrius Clark to present "some type of defense." Tr. 6/1/11, at 16. But after further clarification following that ambiguous question, the juror indicated that it would not affect his judgment if no defense witnesses were called. *Id.* at 17. Thereafter,

none of the defense attorneys moved to strike the juror or attempted to remove him for cause. The claim is based on an isolated statement taken out of context from the rest of the exchange. It is not clearly stronger than the claims raised on direct appeal.

Petitioner's next two claims assert that she was deprived the right of a unanimous verdict when the jury was instructed the jury on both principal and aiding-and-abetting theories of culpability. She also argues that her counsel should have objected on this basis. Petitioner argues that the jurors might not have agreed as to the theory of guilt. Appellate counsel was not ineffective for failing to raise this meritless claim. There is no federal constitutional right to a unanimous verdict in state criminal cases. *Apodaca v. Oregon*, 406 U.S. 404, 406 (1972). And the type of general verdict form complained of here does not violate due process. *See Schad v. Arizona*, 501 U.S. 624 (1991). Counsel was not ineffective for failing to make a meritless objection.

Finally, Petitioner's tenth claim asserts that her trial counsel was ineffective for advising her that he thought he could win at trial and to reject a plea bargain. This claim too was not clearly stronger than those raised on direct appeal. Petitioner makes no claim that the advice was based on an erroneous understanding of the law or on a deficient understanding of what evidence would be presented at trial – the claim is that counsel simply made an unreasonable prediction of

Petitioner's chances at trial. The claim is weak because claims of ineffective assistance of counsel are subject to a deferential standard of review under which counsel's performance is presumed to be competent. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984). And in the context of advice given regarding whether to stand trial or accept a plea bargain, the Supreme Court has stated, "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance." *Lafler v. Cooper*, 566 U.S. 156, 174 (2012). Appellate counsel did not perform deficiently by omitting this claim.

Accordingly, Petitioner fails to demonstrate that her appellate attorney rendered ineffective assistance during her direct appeal, and she therefore fails to demonstrate cause to excuse her procedural default of failing to raise these claims on direct appeal.

The final exception to the procedural default rule allows for review of a claim where constitutional error has probably resulted in the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). A claim of actual innocence must be supported with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Here, Petitioner makes no persuasive claim of actual innocence.

Indeed, and as outlined above, the evidence of her guilt is strong. Petitioner therefore fails to demonstrate entitlement to review of her defaulted claims.

Because none of Petitioner's claims merit habeas relief, the petition will be denied.

## IV.  Motion for Immediate Release

Petitioner filed a Motion for Immediate Release from Custody pending the Court's decision on the habeas petition.  To receive bond pending a decision on the merits of a habeas corpus petition, a petitioner must show a substantial claim of law based on the facts *and* exceptional circumstances justifying special treatment in the interest of justice. *Lee v. Jabe*, 989 F.2d 869, 871 (6th Cir. 1993)(quoting *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990)); *See also Nash v. Eberlin*, 437 F. 3d 519, 526, n. 10 (6th Cir. 2006).  There will be few occasions where a habeas petitioner meets this standard. *Dotson*, 900 F. 2d at 79.

Given that this Court has now denied Petitioner's habeas petition, Petitioner is unable to show a substantial claim of law based on the facts.  As to Petitioner's argument that her underlying health conditions and the COVID-19 pandemic are compelling reasons for release.  The Sixth Circuit has stated that because COVID-19 vaccines are now available to a defendant housed with the Bureau of Prison, the COVID-19 pandemic does not present an "extraordinary and compelling reasons" warranting a sentence reduction.  *United States v. Lemons,* 15 F. 4th 747, 751 (6th

Cir. 2021).  Such an analysis can be applied in this instance where Petitioner is in custody pursuant to a State court conviction and is awaiting a decision on a habeas petition.  Petitioner is unable to show that there exists exceptional circumstances justifying special treatment in the interest of justice based on her medical condition and the COVID-19 pandemic.  Petitioner's Motion for Immediate Release is denied.

## V. Certificate of Appealability

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)(citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of any of Petitioner's claims. The Court will therefore deny a certificate of appealability.

### VI.  Conclusion

Accordingly, for the reasons set forth above, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus (ECF NO. 1), 2) **DENIES** the motion for immediate release (ECF No. 11), and, 3) **DENIES** a certificate of appealability.

**SO ORDERED.**



s/Denise Page Hood
Hon. Denise Page Hood
United States District Judge

Dated: September 27, 2022